IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

GREGORY CARSON, et al.,      )
                    Plaintiffs      )
                              )
                              )      Civil Action No.: JFM-96-2882
                              )
      v.      )
                              )
                              )
GIANT FOOD, INC., et al.,      )
                              )
                Defendants      )
_____)

OPINION

      Eleven plaintiffs have instituted this action against Giant Food, Inc. and several of its executives and managers, alleging employment discrimination. Nine of the plaintiffs have filed a motion for class certification. Although the propriety of class action treatment appeared doubtful on the face of the complaint, I did not want to judge the issue prematurely, particularly in light of allegations concerning racist graffiti, racial epithets used by co-workers and supervisors, and the display of nooses at Giant's warehouses. Accordingly, I permitted a full factual record to be developed before ruling on the class certification motion. That motion is now pending, together with motions for summary judgment filed by defendants as to the individual claims of each of the plaintiffs.

      This opinion addresses several global issues raised by the litigation, relating to (1) class certification, (2) the effect of "early" right-to-sue notices issued by the Equal Employment

Opportunity Commission ("EEOC"), (3) the applicability of the "continuing violation" doctrine

to plaintiffs' claims, (4) the cognizability of various state law claims, and (5) a claim under 42

U.S.C. §1981 against the individual defendants. It also addresses all of the claims asserted by

Gregory Carson, the first named plaintiff, and hostile environment claims asserted by eight of the

plaintiffs. I am issuing separate opinions addressing the merits of all of the other claims asserted

by the ten other plaintiffs.[1]

I.

Plaintiffs seek to have two subclasses certified:[2] (1) "[a]ll current, former and future

African American ("Black") persons who were permanent union employees employed by Giant

and worked at its Distribution Warehouses, including but not limited to Jessup, Landover and

---

[1]As I did in related litigation instituted against Giant by other plaintiffs represented by plaintiffs' counsel in this action, Muhammad v. Giant Food, Inc., Civil No. JFM-98-3565, I am directing the Clerk to open nine different cases for the plaintiffs other than Gregory Carson, the named plaintiff in this action. (Plaintiffs Dallas and Jones filed suit together.) I am doing so because, as the litigation has turned out, it constitutes ten separate employment discrimination actions that have taken substantial time to decide. Therefore, the court should be given credit for the different cases under the work measurement criteria used to determine the resources allocated to individual district courts. Plaintiffs' counsel objected to this administrative action in the Muhammad litigation. Although I had not meant to affect the rights of plaintiffs, in retrospect it may be that by opening separate cases, I unintentionally imposed upon plaintiffs the obligation of paying separate filing fees on appeal. To prevent that from happening here, my accompanying order directs that in the event of an appeal by more than one plaintiff, all of the cases should be consolidated and only one filing fee be paid.

[2]On February 6, 2002, after all papers had been filed and oral argument conducted, Plaintiffs' counsel filed a supplemental memorandum in support of motion for class certification in which she changed the definitions of the proposed subclasses. This supplemental memorandum was not filed in a timely manner and will not be addressed. I do note, however, that although the amended proposed subclasses appear to present less problems than the original subclasses, the same analysis would apply and the amended proposed subclasses would also fail.

Bakery Warehouses during the period of 1980 to present;"[3] and (2) "[a]ll African American ("Black") persons who are former, current and future vacation relief workers at Giant's Distribution Warehouses, including but not limited to Jessup, Landover and Bakery Warehouses who were rejected for permanent employment by Giant during the period of 1980 to present."[4] (See Pl. Amended Mem. for Class Cert. at 4-5.)  The first subclass alleges violations of Title VII through hiring, promotion, discipline, termination, training, racial harassment and hostile work environments, and Giant's fair employment and grievance process.[5]  The second subclass alleges violations of Title VII regarding Giant's hiring and promotion practices.

The burden is on Plaintiffs to demonstrate that their proposed classes meet the certification requirements of Fed. R. Civ. P. 23.  First, they must show that the four prerequisites of Rule 23(a) − numerosity, commonality, typicality, and adequacy of representation − are met. Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 161 (1982).  If those prerequisites are satisfied, Plaintiffs must then demonstrate that their proposed subclasses fit into one of the categories set forth in Rule 23(b).  See Miller v. Baltimore Gas & Elec. Co., 202 F.R.D. 195, 198 (D. Md. 2001) (citing Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 614 (1997)).  Here,

---

[3]Plaintiffs Blocker, Carson, Connor, Ingram, Mathews, Newman and Skipper would represent this subclass.

[4]Plaintiffs Dallas and Jones would represent this subclass.

[5]Plaintiffs seek to represent class members whose experience was entirely different from their own.  For example, they contend that African Americans who were denied employment because of discrimination in Giant's hiring practices should be included in the classes they represent although none of them were discriminated against during the hiring process.  Such an "across-the-board" class is not certifiable.  See E. Tex. Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 403 (1977); Adams v. Bethlehem Steel Corp., 736 F.2d 992, 994 (4th Cir. 1984); Hill v. W. Elec. Co., 596 F.2d 99, 102 (4th Cir. 1979).

although Plaintiffs' first proposed subclass presumably would meet the numerosity requirement of Rule 23(a),[6] neither it nor the second proposed subclass meets the other three requirements. Both subclasses also fail under Rule 23(b).

A.

The commonality requirement of Rule 23(a) is "more easily met when a disparate impact rather than a disparate treatment theory underlies a class claim." Stastny v. Southern Bell Tel. and Tel. Co., 628 F.2d 267, 274 n.10 (4th Cir. 1980). A disparate impact theory is based upon a practice or policy which is neutral or benign in intent but nevertheless has a disproportionately adverse impact upon a protected class without any business justification for the disproportionate impact. Id. at 273-74 (citing Griggs v. Duke Power Co., 401 U.S. 424 (1971)).

Plaintiffs have not identified any neutral practice or policy that lies at the basis of their claims. Rather, it is clear that what Plaintiffs are claiming is that African-Americans were subjected to disparate treatment. That fact alone would not necessarily preclude class action treatment. For example, it has been held that "the use of entirely subjective personnel processes that operate to discriminate . . . satisfy the commonality and typicality requirements of Rule 23(a)." Shipes v. Trinity Indus., 987 F.2d 311, 316 (5th Cir. 1993). Here, however, the record is

---

[6]It is substantially less clear that the second proposed subclass would meet the numerosity requirement. Plaintiffs assert that Giant has rejected 800 African-American vacation relief workers for permanent positions. The exhibits cited by Plaintiffs to support this contention make no reference to vacation relief workers or the number "800." Plaintiffs present virtually no evidence concerning vacation relief workers other than Plaintiffs Dallas and Jones. Plaintiffs do point to several affiants who allegedly experienced the same problems as Dallas and Jones. However, only Charles Guion alleges that he was denied a position improperly under a seniority system. Based on this record, I can only assume that three former African-American vacation relief workers, Dallas, Jones, and Guion, were denied permanent positions given to less senior white vacation relief workers. Clearly, three individuals is not enough to certify a class.

clear that although the disciplinary decisions about which Plaintiffs complain were individualized, they were not entirely subjective in nature but involved the application of general rules to particular employees.

In short, as reflected in my discussion of Giant's summary judgment motions as to the claims of individual employees, in effect, this litigation involves an aggregate of individual disparate treatment claims.[7] Moreover, during the course of their careers, the putative class members worked in at least thirteen different facilities, located in five different towns or cities. This geographical diversity itself would make class treatment inappropriate. See Stastny, 628 F.2d at 278-79; Wright v. Circuit City Stores, Inc., 201 F.R.D. 526, 542 (N.D. Ala. 2001); Zachery v. Texaco Exploration and Prod., Inc., 185 F.R.D. 230, 238-40 (W.D. Tex. 1999); Boston v. Apfel, 182 F.R.D. 188, 195 (D. Md. 1998).[8]

---

[7]Plaintiffs' claims concerning a hostile work environment and the failure to hire vacation relief workers for permanent employment present a somewhat closer question on commonality and typicality. However, as discussed in the text, infra, "rigorous analysis," see Gen. Tel. Co., 457 U.S. at 161, reveals that despite the superficial similarity, the hostile work environment claims of the different plaintiffs vary substantially from one another. Likewise, since the summary judgment record establishes that Giant based its decisions whether to hire vacation relief workers for permanent employment on the basis of their performance, those claims too fail to meet the commonality and typicality requirements. In any event, all proposed classes fail under the adequacy of representation element of Rule 23(a).

[8]Plaintiffs have provided statistical evidence in an attempt to prove general discrimination. However, the statistics are not separated by facilities or departments. Plaintiffs' expert, Harriet Zellner, tested for overall discrimination at Giant stores and warehouses. Additionally, as shown in Tables 8 and 10 of Plaintiffs' report, Zellner tested for discrimination at all warehousing facilities, all recycling facilities and all manufacturing facilities. (See Pl. Ex. 3.) This control for work environment is not specific enough. See Stastny, 628 F.2d at 278-79 (rejecting statistical evidence because the statistics were not probative of separate facilities, but only showed overall disparities); Abram v. United Parcel Serv. Of Am., Inc., 200 F.R.D 424, 431 (E.D. Wis. 2001) (stating that aggregate statistical evidence "masks differences from district to district and from supervisor to supervisor that preclude a finding of 'commonality'").

For these reasons, Plaintiffs have not shown that their proposed subclasses meet the commonality and typicality requirements. Even if they had done so, I could not find that they would adequately represent the class.[9]

The adequacy of representation element requires both the class representatives and the class attorney to adequately represent the class. In this case, Jo Ann P. Myles, Esq., cannot adequately represent the proposed subclasses. Ms. Myles' frequent typographical errors, citation errors and clear misstatements of the law in memoranda and during oral argument prove that the interests of the putative class members will not be adequately served by her representation. Additionally, Ms. Myles has failed to include deposition pages that were essential to her clients' claims, thus, requiring the Court to ask for those transcript pages. Finally, significant financial resources (e.g., to provide notice and to retain experts) are required to represent a class of this size. The history of this litigation, including a dispute between the plaintiffs and their expert over payment, demonstrates the inability of Ms. Myles and the class representatives to meet the financial demands of representing the proposed classes.

B.

Although Plaintiffs' failure to demonstrate that their proposed subclasses would meet the commonality, typicality, and adequacy of representation requirements of Rule 23(a) is dispositive of the certification question, I will add that the highly individual nature of Plaintiffs' individual

---

[9]I declined to reach this question in the related <u>Muhammad</u> litigation, now pending in the Fourth Circuit, in which counsel for Plaintiffs in this litigation sought to represent a class. I chose not to do so (and was prepared to decline to reach the issue again here) to avoid commenting upon the performance of Plaintiffs' counsel unnecessarily. However, during oral argument, Plaintiffs' counsel suggested that because I did not reach the question in <u>Muhammad</u>, Giant was collaterally estopped from raising the issue again. Under these circumstances I have reluctantly concluded that, lest my silence be misinterpreted, I must address the question.

claims also would preclude certification under Rule 23(b)(3). Clearly, it cannot be said that

whatever common questions of law or fact there might be "predominate over questions affecting

only individual members." Lott v. Westinghouse Savannah River Co., Inc., 200 F.R.D. 539, 563

(D.S.C. 2000). Certification also would be inappropriate under Rule 23(b)(2) because the final

relief that would be appropriate were Plaintiffs to prevail would not be injunctive in nature but

would "relate[] exclusively or predominately to money damages." See Fed R. Civ. P. 23(b)(2)

advisory committee's note; Zimmerman v. Bell, 800 F.2d 386, 389 (4th Cir. 1986). In this case,

Plaintiffs have asked almost exclusively for money damages.

II.

Each plaintiff was issued a right-to-sue notice fewer than 180 days after he filed a charge

of discrimination. Giant argues in its motions for summary judgment that the plaintiffs' Title VII

claims are invalid because Title VII does not allow the EEOC to issue a right-to-sue notice fewer

than 180 days after the plaintiff files a charge of discrimination. For the reasons stated below, I

find that the early right-to-sue notices provided by the EEOC are valid.

Title VII provides in relevant part:

> If a charge filed with the Commission . . . is dismissed by the Commission,
> or if within one hundred and eighty days from the filing of such charge . . .
> the Commission has not filed a civil action . . . or the Commission has not
> entered into a conciliation agreement to which the person aggrieved is a party,
> the Commission . . . shall so notify the person aggrieved and within ninety
> days after the giving of such notice a civil action may be brought against the
> respondent named in the charge.

42 U.S.C. § 2000e-5(f)(1). The EEOC has established a regulation that allows it "to issue a right

to sue letter at any time prior to the expiration of 180 days from the date of filing the charge with

the Commission; provided that [an appropriate Commission official] has determined that it is

probable that the Commission will be unable to complete its administrative processing of the

charge within 180 days from the filing of the charge." Miller, 202 F.R.D. at 206 (citing 29 C.F.R

§ 1601.28(a)(2) (1998)).  The validity of this regulation has been a topic of litigation, resulting in

a circuit split on the issue.  The D.C. Circuit found the regulation invalid and required that "Title

VII complainants must wait 180 days after filing charges with the EEOC before they may sue in

federal court." Martini v. Fed. Nat. Mortgage Ass'n, 178 F.3d 1336, 1347 (D.C. Cir. 1999).

Defendant relies on Martini in its argument.  The Ninth, Tenth and Eleventh Circuits have held

that the regulation is a valid exercise of authority by the EEOC.  See Walker v. United Parcel

Serv., Inc., 240 F.3d 1268, 1273-77 (10th Cir. 2001); Sims v. Trus Joist MacMillan, 22 F.3d

1059, 1061-63 (11th Cir. 1994); Brown v. Puget Sound Elec. Apprenticeship & Training Trust,

732 F.2d 726, 729 (9th Cir. 1984).

    The Fourth Circuit recently declined to address the issue.  See Microstrategy, Inc. v.

Lauricia, 268 F.3d 244, 248 (4th Cir. 2001).  However, two judges in this district have recently

upheld the EEOC regulation.  See Miller, 202 F.R.D. at 206; Thomas v. BET Sound-Stage

Restaurant/BrettCo, Inc., 61 F.Supp.2d 448, 459 (D. Md. 1999).  But see Loney v. Carr-Lowrey

Glass Co., 458 F.Supp. 1080, 1081 (D. Md. 1978).  I agree with the reasoning of those cases and

find the Plaintiffs' Title VII claims to be timely.

III.

    Each plaintiff asserts various claims under Title VII and section 1981.[10]  Under Title VII,

---

[10]"Under Title VII and . . . Section 1981, the elements of the required prima facie case are the same." Gairola v. Com. of Va. Dept. of General Services, 753 F.2d 1281, 1285 (4th Cir. 1985).

a plaintiff in a "deferral state," a state that has its own law prohibiting discrimination and an agency enforcing the law, has 300 days after the alleged act of discrimination to file a claim with the EEOC. See Nye v. Roberts, 159 F.Supp.2d 207, 210 (D. Md. 2001).[11] Section 1981 has a three-year statute of limitations in Maryland. See Derrickson v. Circuit City Stores, Inc., 84 F.Supp.2d 679, 687 (D. Md. 2000). This suit was initiated on September 12, 1996 on behalf of all plaintiffs. Therefore, claims dating back to September 12, 1993 are valid under section 1981.

Plaintiffs assert that the continuing violation doctrine should apply to their Title VII and section 1981 claims. It operates to save certain unexhausted, otherwise time-barred claims. See Muhammad v. Giant Food, Inc., 2000 WL 1828248, at *3 (D. Md. 2000). A "continuing violation" occurs in two types of cases: those involving serial discrimination and those involving systemic discrimination. See Redding v. Anne Arundel County, 996 F.Supp. 488, 490 (D. Md. 1998). "A serial violation exists when an employer engages in a series of discriminatory actions derived from 'the same discriminatory animus.'" Id. (citations omitted). A plaintiff must demonstrate that the discrimination complained of is more than isolated or sporadic to establish a serial violation. Id. Systemic violations, on the other hand, occur "where an express policy of unlawful discrimination exists, requiring the plaintiff to prove that the policy 'manifests itself over time.'" Id. (citations omitted). There are two general considerations in determining whether there is a continuing violation: "whether the separate incidents are sufficiently related, and whether the acts individually should have triggered the plaintiff's awareness of and duty to challenge the employer's discriminatory conduct." Muhammad, 2000 WL 1828248, at *3.

---

[11]The plaintiffs filed EEOC complaints on different dates. Each plaintiff's Title VII claims includes events dating back 300 days from the specific date he filed his EEOC complaint.

The claims of the plaintiffs involve isolated and sporadic incidents of harassment.[12]  For example, Plaintiff Newman attempts to invoke the continuing violation doctrine as to a single incident in 1990 when he was asked an offensive question about race by a white manager. Similarly, Plaintiff Mathews asserts that a sole incident where the word "nigger" was inscribed in large bright letters in his locker in the mid-1980's should not be time-barred.  These incidents were clearly discriminatory and should have been challenged at the time they occurred.  Cf. Hill v. AT&T Techs., Inc., 731 F.2d 175, 179-80 (4th Cir. 1984) (stating that an allegation that the continuing violation doctrine applies does not constitute "a talismanic or shibboleth term automatically relieving a claimant of any obligation to comply with the statutory time requirement for the filing of a charge with the EEOC under Title VII").  Accordingly, the continuing violation doctrine does not apply to the plaintiffs' claims under Title VII or section 1981.

## IV.

I will now consider the hostile work environment claims asserted by Plaintiffs.  The record before me clearly demonstrates that racial hostility existed between African-American workers and white workers at the Giant warehouses from 1980 to the time this suit was initiated in 1996.  On at least four occasions, nooses were displayed in the warehouses.[13]  Likewise, racist

---

[12]I note that allegations by Plaintiffs Skipper and Ingram of a continuing pattern of racist graffiti in the trailers may constitute a serial violation because the alleged graffiti was not sporadic.  However, as discussed below, the allegations of graffiti are not sufficient to establish a hostile work environment.  Considering the graffiti over a longer period of time does not alter that determination.

[13]Five plaintiffs refer to a noose in their pleadings.  Carson refers to the Jessup noose.  He heard about the noose second-hand and, therefore, its effect on his claim is minimal.  Connor

graffiti written on the walls of trailers used to transport products from the warehouses to Giant's retail stores was a constant problem. Finally, there is evidence that managers and supervisors used racist epithets and made other racially offensive remarks.

These incidents, whether considered alone or together, are reprehensible. However, the different plaintiffs had substantially different experiences and the hostile work environment claim of each plaintiff must be considered on its own individual merits. I have concluded that only the claim of Gregory Carson under section 1981 survives summary judgment.

A.

Carson was a dockman in the Jessup warehouse beginning in 1990. At unspecified times from 1993 to 1995, white co-workers of Carson would throw bananas at him and make ape noises on the warehouse microphone. While this was occurring, Mike Majors, one of Giant's managers, would laugh at the white employees, but would not discipline or stop them. On several occasions during 1994 and 1995, a white co-worker called Carson a "nigger." (Carson Dep. at 296.) Sometime in 1995, Majors remarked to Carson that white people could send people to the moon, but black people were only good for sticking bones through their noses.[14]

---

also refers to the Jessup noose, but notes that he simply kept cleaning after he saw it. Skipper and Ingram refer to all three nooses in the Landover warehouse. The 1991 noose incident is time-barred. The 1995 and 1996 noose incidents are not time-barred, but the plaintiffs fail to allege who placed the nooses, whether they complained about the nooses and whether management removed the nooses in a timely manner. Therefore, they have failed to present any evidence that would establish Giant's liability. Finally, Mathews states that he saw two nooses, but he provides insufficient details and no dates. Thus, he has not demonstrated either that the incidents occurred during the relevant time period or that Giant can be held liable for them.

[14]Carson states that Majors made numerous racially offensive jokes daily, but there are no details surrounding other jokes.

(Id. at 280.)  Also in 1995, Majors placed dough in the front zipper of his pants and said that he was depicting a black penis, commenting that black men have larger penises.  (Id. at 132-33.)

At indefinite times during Carson's employment, white managers would point to racist graffiti in warehouse trailers depicting African-Americans with big lips and noses and tell Carson that the graffiti reminded them of Carson.  (Id. at 43-44.)  On January 1, 1996, a van being driven by a white employee, available to drive employees one mile from the parking lot to the warehouse, would not stop for Carson.  On January 18, 1996, a white employee posted pictures of monkeys and apes in the warehouse and wrote Carson's name under one of the pictures. Carson had to remove the pictures himself, a full day after they were posted and viewed by several employees, including managers.  (Id. at 133-38.)  On several occasions, white employees would arrive at work and spend up to 30 minutes reading the paper and drinking coffee without suffering any discipline while Carson was screamed at by a manager for reporting to the warehouse floor a few minutes late.  Until 1997, there were two locker rooms at the warehouse. The smaller, less desirable locker room was assigned to all African-American employees and one white employee. It was referred to as the "nigger locker room" by white managers and employees.[15]  Carson's locker was in this smaller locker room.  (Id. at 171-79.)

Wilbert Skipper, Jr., a produce selector in the Landover warehouse, claims that a manager, Bob Bennett, called him a "nigger" and harassed him by following him throughout the warehouse. He states that he overheard white co-workers use the term "nigger" in the warehouse

---

[15]Three or four African-American employees had lockers in the more desirable, larger locker room.  (See Carson Dep. at 173.)

approximately thirteen times in the four years prior to his filing suit[16], and that he was exposed daily to racist graffiti in truck trailers and restrooms that included such statements as, "Kill all niggers at Giant Foods," "Black babies are crack babies" and "KKK will kill all niggers at Giant Foods." (Skipper Dep. at 246-50, 262, 267-69.)[17]

William Ingram, a produce selector in the Landover warehouse, allegedly was exposed daily to racist graffiti scrawled on Giant truck trailers, including such epithets as "kill all niggers at Giant Food."[18]

David Newman, an employee in the Landover warehouse who held several positions, viewed racially offensive graffiti in the bathrooms and trailers that included the words "monkey" and "nigger." Newman does not specifically describe any of the graffiti or how often he saw it.

---

[16]Skipper also stated on deposition that on approximately twelve other occasions African-American co-workers called him "nigger." However, he further testified that the use of the word "nigger" by African-Americans was not offensive to him.

[17]Skipper also claims to have seen a picture of a monkey, ape, and bear with the caption "just blacks" on a bulletin board in 1997 or 1998. Under Fed. R. Civ. P. 15(d), a plaintiff must move the court for leave to file a supplemental pleading setting forth occurrences which happened after the date of the amended complaint. See Young-Henderson v. Spartanburg Area Mental Health Ctr., 945 F.2d 770, 775 (4th Cir. 1991). Since Skipper has not filed a supplemental pleading, this incident is not considered part of his hostile work environment claim.

[18]Ingram also makes allegations about several separate incidents that occurred prior to 1993, including ones where (1) a co-worker referred to African-American employees as "niggers," (2) a manager called a black employee a "black monkey," and (3) Ingram heard a manager state that white employees were better selectors than black employees. To the extent that Ingram seeks to state independent claims based upon these allegations, the claims are time-barred. Moreover, while extremely disturbing, the incidents were sporadic and, although evidence of them would perhaps be admissible under Rule 404, they were not sufficiently pervasive to establish a hostile work environment when considered in connection with incidents that later occurred.

Melvyn Connor, a dockman in the Jessup warehouse, has provided specific evidence of only one alleged incident of harassment after September 12, 1993:  seeing a hanging noose in the warehouse in 1995.[19]  Additionally, Connor witnessed racist graffiti during his last several years of employment before he was terminated in 1995.

Maurice Mathews, an employee in the Landover warehouse, was exposed to racist graffiti in the trailers that included the word "nigger" and to pictures of apes and monkeys labeled with the names of other African-American employees.[20]

Jerry Mungro, a truck driver, alleges that Chris Balodemas, the head of Giant's Transportation Department, said in response to a comment by Mungro about forgetting to contact dispatchers when he was delayed: "I see you didn't forget to put on your gold chains when you got dressed this morning."  Additionally, Mungro states that one white driver would make comments over the CB radio such as, "[N]igger, get off the CB, go lay your nappy head down."  Finally, he claims he saw racist graffiti on Giant truck trailers that included "[h]anging nooses" and words like "[n]iggers," "[s]pear chuckers," and "[b]ush boogers."

Finally, Kirb Qualls, an employee at the produce department in Giant Store # 50, had his car tires slashed on four occasions from November 1994 to August 1996.  There were also

---

[19]Connor does not present any specific evidence of the dates concerning three other allegations he makes:  that a manager harassed him in the bathroom, that he was assigned pallet duty alone, and that he was called a monkey by a co-worker.

[20]Mathews also alleges that in the mid-1980s the word "nigger" was written all over his locker and that in 1989 Giant allegedly refused to take him to the hospital.  Like Ingram's allegations relating to pre-1993 incidents, see supra n.18, these allegations neither give rise to independently actionable claims nor constitute sufficient background evidence to render Mathews' graffiti allegations actionable as a hostile work environment claim.

instances of graffiti concerning Qualls, but none included racially derogatory content.[21]

B.

A prima facie case of hostile work environment consists of the following elements:

> (1) the harassment was unwelcome;
> (2) the harassment was based on [Plaintiff's] race . . . ;
> (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and
> (4) there is some basis for imposing liability on the employer.

Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998). The plaintiffs fall into four groups based on the alleged harassment they experienced: (1) Carson, who alleges inappropriate harassment by managers during the relevant time period and graffiti specifically aimed at him; (2) Skipper and Ingram, who allege with specificity the content and frequency of the racist graffiti they saw in warehouse trailers; (3) Newman, Connor, Mathews and Mungro, who allege that they witnessed offensive graffiti in the trailers, but do not allege how often they saw the graffiti and, with the exception of Mungro, do not specifically describe the graffiti; and (4) Qualls, who did not work in Giant warehouses and only alleges isolated instances of harassment that are not established to be based on race. It is undisputed that the harassment of the plaintiffs, other than Qualls, was unwelcome and based on race. Therefore, my analysis as to those plaintiffs' claims will focus on the final two elements.

---

[21]On one occasion, an employee drew a picture in the bathroom of Qualls with sexually offensive content and the words "Kirby the tire man" written under the picture. Somewhere between 1994 and 1996, someone wrote a derogatory remark concerning Qualls next to his name on a union decal in the workplace. On another occasion, an employee wrote a sexually explicit reference to Qualls and his family in the downstairs bathroom. The only instance of racist graffiti involving Qualls is time-barred.

C.

Several factors are considered when determining the severity and pervasiveness of harassment: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating or a mere offensive utterance; and (4) whether it unreasonably interferes with [the] employee's work performance." Smith v. First Union Nat. Bank, 202 F.3d 234, 242 (4th Cir. 2000) (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993)).

1.

Carson experienced significantly worse harassment during the relevant time period than the other plaintiffs. The incidents of harassment were frequent during the period in question, several remarks or actions were specifically directed at Carson and most incidents involved the highly offensive word "nigger" or comparably offensive language or conduct. Additionally, many incidents involved Carson's managers or supervisors, which is particularly troubling. Moreover, Carson's co-workers are able to "buttress" some of his claims. See e.g., Collier v. RAM Partners, Inc., 159 F.Supp.2d 889, 899-900 (D. Md. 2001); see also Mundell Aff. ¶ 10 (verifying that pictures of apes and monkeys were displayed in the warehouse); Isaac Aff. ¶ 9 (explaining that the parking lot van would not stop for African-American employees). Thus, the alleged harassment experienced by Carson is clearly actionable under section 1981.[22]

---

[22]Summary judgment will be, however, granted on Carson's hostile work environment claim under Title VII because most of the alleged instances of harassment occurred prior to the 300 day reporting requirement under Title VII. The incidents that clearly took place during the 300 days are the posting of monkey pictures, the incident where Carson was not picked up by a van, Carson's assignment to the smaller locker room and Carson's manager screaming at him for being late. These incidents are not alone sufficient to establish severe and pervasive harassment.

Case 1:96-cv-02882-JFM    Document 311    Filed 02/20/2002    Page 17 of 32

2.

The claims of Skipper and Ingram essentially consist of allegations of offensive racist

graffiti they viewed daily.[23]  Skipper was also called "nigger" by his manager on one isolated

occasion.[24]  Sexist and racist graffiti certainly contribute to the existence of a hostile work

environment.  See, e.g., Carter v. Chrysler Corp., 173 F.3d 693, 701 n.7 (8th Cir. 1999) (finding

graffiti relevant to hostile environment); Waltman v. Int'l Paper Co., 875 F.2d 468, 478 (5th Cir.

1989) (finding graffiti and other incidents of harassment created a dispute as to whether the

workplace was a hostile environment).  Plaintiffs have not, however, cited any case (and I have

found none) where graffiti alone has been found sufficient to establish severe and pervasive

harassment.

---

[23]Skipper alleges that his manager followed him around the warehouse and announced his productivity over a loudspeaker.  Ingram also alleges that his productivity was announced over a loudspeaker.  There is no evidence that these incidents were based on race.  This is not unique to Skipper and Ingram.  Throughout Plaintiffs' papers, Plaintiffs' counsel asserts numerous incidents that nothing in the record establishes as being connected to race.  For example, Carson alleges that he could not listen to the radio stations he desired and could not play on the company softball team.  Because of the lack of evidence tying such incidents to race, they cannot be considered as establishing a legally actionable hostile work environment.

[24]I decline to find Giant liable for the alleged use by Skipper's white co-workers of the racist epithet "nigger" approximately thirteen times during the four years prior to this lawsuit.  Skipper has stated that he was unable to recall the names of any of his white co-workers who used the term, and he could not offer any specifics of the incidents.  (Skipper Dep. at 248.)  General allegations lacking in dates, times, and circumstances are without the particularity required to support a claim of racial harassment.  See Carter v. Ball, 33 F.3d 450, 461-62 (4th Cir. 1994) (holding that "general allegations do not suffice to establish an actionable claim of harassment"); Fisher v. Maryland Dep't of Hous. & Cmty. Dev., 32 F.Supp.2d 257, 262 (D. Md. 1998), aff'd 166 F.3d 1208 (4th Cir. 1998).  Further, Skipper acknowledges that he did not complain to managers or file a complaint with Giant's Fair Employment Office ("FEO") when the incidents occurred, although he complained to the FEO after this lawsuit was filed.  (Skipper Dep. at 248-49.)

Here, the content of the graffiti was as offensive as one can imagine, and Skipper and Ingram testified they viewed it daily. However, the severity and pervasiveness of the graffiti must be considered in context. The record establishes that the graffiti was written in 45-foot-long trailers that were driven to the warehouses or on the walls of the bathrooms. It appeared amidst other tasteless but non-racist graffiti of all sorts, and it was written in regular size. Although offensive to African-Americans (and anyone with good sense and good values), it was not menacing but simply reflected the unfortunate fact that there are prejudiced people in the world. Moreover, none of the graffiti was directed personally at Skipper or Ingram, contrary to most cases in which graffiti is found to be part of a hostile work environment. See e.g., Chrysler, 173 F.3d at 701. Under these circumstances, I do not find that the graffiti standing alone satisfies the third element of a prima facie case.[25]

3.

The claims of Newman, Connor, Mathews and Mungro consist of allegations of offensive racist graffiti, including the word "nigger," and pictures of monkeys that appeared in trailers and bathrooms. However, unlike Skipper and Ingram, Newman, Connor, Mathews and Mungro are unable to describe with specificity how often they viewed the graffiti. Newman, Connor and Mathews also are unable to describe the specific content of the graffiti they viewed.[26] For the

---

[25]This is not to say that an employer must not be alert to the existence of racist (or sexually harassing) graffiti and take steps to remove or paint over it when it appears. The record establishes that Giant is now doing so. If it did not, I would entertain a motion for injunctive relief.

[26]Mungro claims that his manager made a racially offensive comment to him. It is an isolated incident that does not constitute a hostile work environment. Mungro also claims other drivers made racially offensive comments over the CB radio. These incidents are not sufficiently

reasons discussed above, the graffiti in the trailers is not sufficient to establish a prima facie case of a hostile work environment.

4.

The hostile work environment claim of Qualls is different from the claims of the plaintiffs employed at the warehouses. Qualls' claim consists of four tire slashing incidents and graffiti. Qualls has presented no evidence the tire slashings or graffiti were based on race. Therefore, these allegations cannot support a claim of hostile work environment. See Jackson v. Maryland, 171 F.Supp.2d 532, 541 (D. Md. 2001); Smith v. Allied Sys., Ltd., 2000 WL 708909, at *5 (D. Md.2000), aff'd, 232 F.3d 889 (4th Cir.2000).[27]

D.

Giant's primary challenge to Carson's prima facie case is that he cannot establish the fourth element – a basis for imposing liability on Giant. In this case, incidents of harassment involved Carson's supervisors and co-workers. A separate analysis is required for each.

For incidents involving supervisors or managers, agency principles have been applied in determining whether the employer is liable. In Faragher v. City of Boca Raton, 524 U.S. 775, 807-08 (1998), and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764-65 (1998), the Supreme Court established a defense whereby an employer can avoid liability for a supervisor's sexual

---

particularized, as to the dates, frequency and circumstances in which they occurred, to determine whether they occurred during the relevant time period or whether there is any basis to hold Giant liable for the harassment. See Carter, 33 F.3d at 461-62.

[27]Both white and African-American employees had their tires slashed. Additionally, all four tire-slashing incidents occurred at Qualls' home. Following the tire slashing in August 1996, Qualls discovered that William Donahue, a co-worker, was the perpetrator. Giant fired Donahue when it was notified of the incident.

harassment of an employee.[28]  This defense consists of two elements that must be established by

a preponderance of the evidence: (1) "that an employer exercised reasonable care to prevent and

correct promptly any . . . harassing behavior," and (2) "that the plaintiff employee unreasonably

failed to take advantage of any preventive or corrective opportunities provided by the employer

or to avoid harm otherwise."  Faragher, 524 U.S. at 807.

First, Giant has presented sufficient evidence that it had an anti-harassment policy in

place at the time of the events.  "Distribution of an anti-harassment policy provides 'compelling

proof' that the company exercised reasonable care in preventing and promptly correcting . . .

harassment."  Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 266 (4th Cir. 2001);

accord Lissau v. S. Food Serv., Inc., 159 F.3d 177, 182 (4th Cir. 1998).  Giant set forth policies

that were in place from 1991 to the present that described Giant's alleged dedication to fair

employment and creating a safe work environment free of harassment. (See Harris Dec. ¶¶ 12-

19.)  This policy stated that incidents of harassment "should be reported directly and promptly"

to the FEO at Giant.  (See Carson Mem. Exs. C, F and H.)  The policy was set forth in Giant's

employee handbook and in pamphlets and outlined on large posters displayed in the common

areas at Giant.  (See Harris Dec. ¶¶ 17-19.)

Giant argues that the second element is satisfied because Carson failed to complain to the

FEO.  An employee's "failure to use any complaint procedure provided by the employer . . . will

normally suffice to satisfy the employer's burden under" this element.  Ellerth, 524 U.S. at 765

---

[28]The Fourth Circuit noted that "[a]lthough Ellerth and Faragher each specifically dealt
with claims of sexual harassment, the developing consensus is that the holdings therein apply
with equal force to other types of harassment claims under Title VII."  Spriggs v. Diamond Auto
Glass, 242 F.3d 179, 186 n.9 (4th Cir. 2001).

(emphasis added). In this case, Giant argues that Carson did not complain to the FEO, except once in 1990. (See Carson Mem. at 23; Carson Dep. at 46-49, 56.) However, Carson did complain to warehouse managers and supervisors on numerous occasions. (See, e.g., Carson Dep. at 133 (stating that he complained to Manager Tom Maynard about the incident where Majors placed dough in his zipper); Carson Dep. at 178 (stating that he complained about the locker room segregation and conditions); Carson Dep. at 281 (stating that he complained to Maynard about Majors' racially offensive jokes.))[29]   The Faragher Court observed "that a victim has a duty to use such means as are reasonable under the circumstances to avoid or minimize the damages that result from violations of the statute." 524 U.S. at 806. There is no strict requirement that an employee follow an exact reporting procedure set forth by an employer. Furthermore, the Fourth Circuit has stated that complaining to one's managers satisfies the plaintiff's reporting requirement. See E.E.O.C. v. R&R Ventures, 244 F.3d 334, 341 (4th Cir. 2001) ("[The plaintiffs] . . . complained at virtually every opportunity available. It therefore cannot be said, as a matter of law, that [the plaintiffs] failed to take advantage of any corrective opportunities."). Additionally, the Giant policy itself states that an employee "should," not "must," report incidents to the FEO. (See Carson Mem. Ex. C, F and H; see also Carson Mem. Ex. 1 (stating that there are a number of fair employment policies, not one single policy to be followed.)) Moreover, if the Giant policy had been strictly followed, Carson's managers and

---

[29]Carson even stated: "I complained all the time. I complained about every damn thing. Excuse me, I complained every day." (Carson Dep. at 286.) Giant argues that Carson's deposition testimony is self-serving. However, at summary judgment, the court's role is not to weigh testimony. Carson asserts more than general complaints. He testifies about complaints he made to specific individuals and, several times, he provides specific dates.

supervisor who knew of the incidents should have themselves reported the incidents to the FEO. They did not. Therefore, Giant has not satisfied the second element of the Faragher/Ellerth defense and can be held liable for the racial harassment by its managers.

For incidents involving co-workers, an employer may be found liable "only for [its] own negligence in failing, after actual or constructive knowledge [of the harassment], to take prompt and adequate action to stop it." Mikels v. City of Durham, N.C., 183 F.3d 323, 332 (4th Cir. 1999). Giant argues that there is no evidence it should have known of the alleged harassing conduct Carson was being subjected to by co-workers. However, Carson has presented evidence that he complained to managers about the actions. (See Carson Dep. at 138-39 (stating that he complained to warehouse manager Maria Myers about the pictures of monkeys and gorillas); Carson Dep. at 296 (stating that he complained to Maynard about a co-employee calling him a "nigger.")) In some instances, managers and supervisors witnessed and laughed at the conduct. (See, e.g., Carson Dep. at 137 (stating that Majors watched and laughed as a co-worker hung up the pictures of monkeys and gorillas.)) Therefore, Giant managers knew about the alleged harassing conduct and Giant can be held liable for the racial harassment by Carson's co-workers. Carson has established all of the elements of a prima facie case.

V.

Plaintiffs have asserted claims against Giant and several individual defendants, who were employed in various managerial and supervisory positions at Giant during the employment periods of the plaintiffs, for quantum meruit, discrimination under the Maryland Fair Employment Practices Law, intentional infliction of emotional distress, negligent infliction of

emotional distress, breach of contract and wrongful termination.[30]  The defendants' motions for
summary judgment will be granted as to these claims.

A.

"A recovery under a theory of quantum meruit generally 'is not applicable when
compensation of the parties is covered by an express written contract.'" Abt Assoc., Inc. v.
JHPIEGO Corp., 104 F.Supp.2d 523, 534 (D. Md. 2000) (quoting Mass Transit Admin. v.
Granite Constr. Co., 471 A.2d 1121, 1126 (Md. Ct. Spec. App. 1984).  The rationale of a claim
based on a theory of quasi-contract is that a defendant should not be unjustly enriched by a
benefit bestowed upon it by the plaintiff.  Id.  When there is no real promise by defendant to pay
plaintiff, the law thus implies such a promise.  Id.  Conversely, where an actual promise to pay
does exist, there is no need to imply one.  Id.  (citing Attorney Grievance Comm'n v. McIntire,
405 A.2d 273 (Md. 1979)).  In this case, each Plaintiff was a member of a local union and each
plaintiff's employment terms were covered under the collective bargaining agreement between
Giant and his union.

Plaintiffs argue that the collective bargaining agreements do not cover every matter of
services and compensation and thus are not express contracts in this situation.  It is true that
"when an express contract does not fully address a subject, a court of equity may impose a
remedy to further the ends of justice."  Klein v. Arkoma Prod. Co., 73 F.3d 779, 786 (8th Cir.
1996).  However, Plaintiffs have pointed to no evidence demonstrating that any of them
performed extra service not covered by the collective bargaining agreement governing their

---

[30]The seven individual defendants are Pete Manos, Sam Thurston, Maria Myers, Robert
Haywood, Deborah Lilly, Chris Balodemas and Tom Maynard.

relationship with Giant.

B.

Maryland Fair Employment Practices Law, Md. Code Ann., art. 49B § 14 ("Article 49B")

does not provide a private cause of action.  See Maryland Comm'n on Human Relations v.

Downey Communications, Inc., 678 A.2d 55, 79 (Md. 1996); see also Jordan v. CSX Intermodal,

Inc., 991 F.Supp. 754, 756 n.1 (D. Md. 1998) (stating that Article 49B "empower[s] only the

Maryland Human Rights Commission to initiate litigation upon an employer's refusal to comply

with the Commission's orders" and "does not create a private cause of action").[31]  Article 49B is

a state administrative remedy that only provides for injunctive relief.  See Makovi v. Sherman-

Williams Co., 540 A.2d 494, 498 (Md. Ct. Spec. App. 1988), aff'd, 561 A.2d 179 (Md. 1989).

C.

To support a prima facie case of intentional infliction of emotional distress, a plaintiff

must show: (1) the conduct is intentional or reckless; (2) the conduct is extreme and outrageous;

(3) there is a causal connection between the wrongful conduct and the emotional distress; and (4)

the emotional distress is severe.  White v. Maryland Trans. Auth., 151 F.Supp.2d 651, 658 (D.

Md. 2001).  The fourth element "requires the plaintiff to show that he suffered a severely

disabling emotional response to the defendant's conduct."  Bryant v. Better Bus. Bureau of

---

[31]Plaintiffs rely upon Molesworth v. Brandon, 672 A.2d 608 (Md. 1996), for the proposition that Article 49B creates a cause of action for an improper discharge where that discharge is the result of discrimination condemned by section 14 of Article 49.  This interpretation of Molesworth is inaccurate.  In Molesworth, the Court determined that section 14 supports a common law claim of wrongful discharge against an employer exempted as a small business under Art. 49B, § 15(b).  Id. at 637.  Giant is not a small business exempted under section 15 (b).

Greater Maryland, Inc., 923 F. Supp 720, 748 (D. Md. 1996) (quoting Harris v. Jones, 380 A.2d

611, 616 (Md. 1977) (emphasis in original). "The law intervenes only where the distress

inflicted is so severe that no reasonable man could be expected to endure it." Bryant, 923

F.Supp. at 748-49.   In Bryant, the plaintiff felt demeaned, humiliated and suffered extreme

mental anguish and outrage.  Additionally, the plaintiff suffered from irritable bowel syndrome,

needed counseling by a therapist, had disturbed sleep, was in a depressed mood and was placed

on antidepressant drugs by a doctor.  Still, the Court found that there was no severe distress

because the distress did not interfere with the plaintiff's ability to attend work or look for a new

job.  Id. at 750.  Here, Plaintiffs offer no evidence of any emotional distress comparable to the

distress suffered by the plaintiff in Bryant, which itself was legally insufficient.  There is also no

evidence that any of the Plaintiffs were unable to perform their duties at work due to emotional

distress.

D.

Maryland does not recognize an independent claim for negligent infliction of emotional

distress.[32]  See Miller v. Bristol-Myers Squibb Co., 121 F.Supp.2d 831, 839 (D. Md. 2000);

Lapides v. Trabbic, 758 A.2d 1114, 1122 (Md. Ct. Spec. App. 2000).  Accordingly, I will grant

summary judgment on these claims as well.

---

[32]Plaintiff relies on Hamilton v. Ford Motor Credit Co., 502 A.2d 1057 (Md. Ct. Spec. App. 1986), for the proposition that one can assert a claim for negligent infliction of emotional distress.  However, the Court in Hamilton clearly states that there is no recovery in Maryland for negligent infliction of emotional distress.  Id. at 1065-66.  The Court in Hamilton simply points out that under a claim of intentional infliction of emotional distress, the tort need not be intentional in all circumstances; an actor can be liable for emotional distress if the injury is inflicted by extreme and outrageous recklessness.  Id. at 1066.

-25-

E.

Finally, the defendants move for summary judgment on Plaintiffs' claims for breach of contract and wrongful termination.[33]  First, I will address the breach of contract claims. Only parties to a contract can enforce that contract and they may only enforce it against parties to the contract.  Copiers Typewriters Calculators, Inc. v. Toshiba Corp., 576 F.Supp. 312, 322 (D. Md. 1983).  Therefore, there must be a contract between the parties for there to be a breach.  Plaintiffs have produced no evidence that there was a contract between any of the Plaintiffs and any defendant other than the collective bargaining agreement.[34]  Accordingly, there is no possible claim for breach of contract.

Second, when stating a claim for abusive discharge, Plaintiffs must show that their terminations contravened a clear mandate of public policy.  See Jones v. Giant Food, Inc., 2000 WL 1828283, at *3 (D. Md. 2000); Orci v. Insituform E., Inc., 901 F.Supp. 978, 982 (D.Md. 1995); Chappell v. S. Md. Hosp., Inc., 578 A.2d 766, 768-71 (Md. 1990).  The purpose of the tort of abusive discharge is to vindicate a public policy in the absence of any civil remedy.  See Jones, 2000 WL 1828283 at *3.  "Preclusion [of an abusive discharge claim] . . . applies only when the public policy sought to be vindicated is expressed in a statute which carries its own

---

[33]I will also refer to the claim of "wrongful termination" as a claim for "abusive discharge" or "wrongful discharge."

[34]As Defendants point out, if the Plaintiffs were asserting a breach of their collective bargaining agreements, these claims would also be barred as a matter of law.  Claims regarding the interpretation and application of collective bargaining agreements are governed solely by Section 301 of the Labor Management Relation Act, 29 U.S.C. § 185 ("LMRA").  See United Steelworkers v. Rawson, 495 U.S. 362, 368 (1990); Jones v. Giant Food, Inc., 2000 WL 1835393, at *5 (D. Md. 2000).

remedy for vindicating that public policy." Insignia Residential Corp. v. Ashton, 755 A.2d 1080,

1086 (Md. 2000); see also Makovi v. Sherwin-Williams Co., 561 A.2d 179, 182 (Md. 1989)

(holding that there was no valid wrongful discharge claim where Title VII and Article 49B

specifically provided remedies for the alleged public policy violation).

Abusive discharge suits for employment discrimination are generally precluded because

federal and Maryland anti-discrimination laws create a civil remedy to vindicate discrimination

in employment settings. Jones, 2000 WL 1828283, at *3; Makovi, 561 A.2d at 182. The Court

in Insignia clarified the type of situation in which an abusive discharge claim will be allowed.

Thus, an employee was fired for refusing to have sex with her employer under circumstances that

would have amounted to prostitution. The Court in Insignia held that a wrongful discharge claim

was not precluded because Maryland's anti-prostitution statute created a clear public policy, but

did not create a private cause of action. See Jones, 2000 WL 1828283, at *3; Insignia, 755 A.2d

at 1086; see also Watson v. Peoples Sec. Life Ins. Co., 588 A.2d 760, 769 (Md. 1991) (allowing

wrongful discharge claim to go forward where an employee was terminated following the

initiation of a suit against her employer in which she alleged a co-worker had sexually harassed

her and assaulted and battered her).

Plaintiffs have alleged that they were discharged for exercising their First Amendment

rights to free speech and that under the reasoning of Insignia their claim is valid. However, the

only sort of speech alleged here, filing charges with the EEOC, is specifically protected by Title

VII. Therefore, Makovi, not Insignia, is controlling.

VI.

Plaintiffs have also asserted a claim against the individual defendants under 42 U.S.C. §

1981. I have previously dismissed that claim against one of the defendants, Tom Maynard.[35]

The individual defendants have now moved for summary judgment on the section 1981 claim

against them.

Directors or managers can be held personally liable when they "intentionally cause a

corporation to infringe the rights secured by" section 1981. Tillman v. Wheaton-Haven

Recreation Ass'n, Inc., 517 F.2d 1141, 1145 (4th Cir. 1975); see also Shirkey v. Eastwind Cmty.

Dev. Corp., 941 F. Supp. 567, 572 (D. Md. 1996) (requiring intentional discrimination in order

to establish a section 1981 violation), modified on other grounds, 993 F. Supp. 370 (D. Md.

1998).  Here, Plaintiffs have only alleged that the individual defendants were aware of racial

problems and graffiti in the workplace after they occurred and did not respond properly.  There is

no evidence that any of the individual defendants directed, participated in or even approved of

intentional discrimination.  Since there is no direct or circumstantial evidence of intentional

discrimination, I will grant summary judgment on the section 1981 claims against the individual

defendants.

VII.

I will now address the remaining claim of Plaintiff Gregory Carson against Giant.  This

claim is for disparate treatment under 42 U.S.C. § 1981 in connection with a suspension that was

imposed upon him in September 1994.

---

[35]I also previously dismissed a series of other claims against all individual defendants, including claims under section 1985, section 1986, the Equal Pay Act, Title VII, the Age Discrimination in Employment Act, and the Americans with Disabilities Act. See Carson v. Giant Food Inc., Civil No. JFM-96-2882, slip op. (D. Md. Aug. 7, 1997).

-28-

A.

Carson was hired by Giant as a vacation relief worker at Giant's Landover, Maryland

warehouse in August 1985. Carson was hired into a permanent position as a dockman in the

Landover warehouse in November 1985. In 1990, Carson moved to the salvage department at

Giant's Jessup, Maryland warehouse, where he is still employed. Throughout his employment at

Giant, Carson has been a member of the International Brotherhood of Teamsters, Chauffeurs,

Warehousemen and Helpers of America, Local 922 ("Local 922").

On September 24, 1994, Carson, while on the warehouse floor, pushed a cart towards a

co-worker. Another employee, Tyrone Mundell, was operating a powered hand jack and ran the

jack into the cart. Mundell then purposely fell backwards off the jack and pretended to be

injured. Supervisor Jake Guthridge saw Mundell and, believing that Carson had caused the

accident and injury to Mundell, ran to Carson and proceeded to scream at him. (See Carson

Dep. at 199-200.) In response, Carson became angry and argued with Guthridge about what had

transpired.[36]

As a result of this incident, Maria Myers, the general manager of the warehouse,

suspended Carson for insubordination pending an investigation. Following that investigation and

a grievance hearing on October 3, 1994, Carson was reinstated on the condition he undergo a

---

[36]The parties dispute the details surrounding Carson's reaction towards Guthridge. Giant
asserts that Carson screamed and cursed at Guthridge, refused a directive to leave the warehouse
floor and report to the office, kicked over several empty milk crates and approached Guthridge
with clenched fists. Carson argues that he never raised his voice at Guthridge, never cursed at
Guthridge and never approached Guthridge with a clenched fist. Carson also asserts that another
white employee struck Carson's leg with a dairy cart while Carson was arguing with Guthridge,
and that this other employee was never disciplined. As discussed below, this factual dispute is
not a material one.

drug test. According to Giant, the purpose of this drug test was to determine if Carson was using steroids since he had reportedly acted violently. (Myers Dep. at 55-56.) Carson agreed to this condition and returned to work. The result of the drug test was negative.

B.

"As a general matter, to make out a prima facie case for employment discrimination, the Plaintiff must show that: (1) he is a member of a protected group; (2) he earned satisfactory performance marks; (3) he suffered an adverse employment action; and (4) other similarly situated employees outside his protected class were treated more favorably." McCain v. Waste Mgmt. Co., 115 F.Supp.2d 568, 573-74 (D.Md. 2000) (citations omitted).

Only the fourth of the elements is disputed. Giant states that Carson screamed and cursed at Guthridge, refused a directive to leave the warehouse floor and report to the office, kicked over several empty milk crates and approached Guthridge with clenched fists. Carson argues that he never screamed or cursed and never approached Guthridge with clenched fists. There is thus a factual dispute concerning what actually occurred during the confrontation between Carson and Guthridge and it is, therefore, unclear how to define "similarly situated employees." However, this dispute is not material because even if Carson could establish a prima facie case, he cannot establish pretext as discussed below.

Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to produce evidence that the plaintiff was suspended for a legitimate, nondiscriminatory reason. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).

If the employer meets this burden, the presumption of discrimination

-30-

> is eliminated, and the plaintiff bears the ultimate burden of proving
> by a preponderance of the evidence that the employer's
> nondiscriminatory reasons are pretextual and that the adverse
> employment action was actually taken because of the employee's
> race or national origin.

Obi v. Anne Arundel County, 142 F.Supp.2d 655, 660 (D. Md. 2001). Giant has articulated a

legitimate, nondiscriminatory reason for suspending Carson: Giant believed that Carson had

verbally and physically threatened his manager. (See Myers Dec. at ¶ 7; Myers Dep. at 55-56,

61-62.) Carson is unable to establish that this reason is a pretext for discrimination.

Carson argues that Giant has "trumped up" this explanation simply for the purpose of this

litigation. The final decision to suspend Carson was made by Maria Myers, general manager of

the Landover warehouse, based on her evaluation of the confrontation and her discussions with

Guthridge. (See Carson Mem. Def. Ex. C.) Although Carson disagrees with Myers' decision

and with Guthridge's version of the confrontation, he presents no evidence that Myers did not

actually believe Guthridge. "While reviewing the employer's articulated reasons for discharge

and the plaintiff's refutation thereof, we must keep in mind that 'Title VII is not a vehicle for

substituting the judgment of a court for that of the employer.'" DeJarnette v. Corning Inc., 133

F.3d 293, 299 (4th Cir. 1998) (quoting Jiminez v. Mary Washington College, 57 F.3d 369, 377

(4th Cir. 1995)). "[W]hen an employer articulates a reason for discharging the plaintiff not

forbidden by law, it is not our province to decide whether the reason was wise, fair, or even

correct, ultimately, so long as it truly was the reason for the plaintiff's termination." Id.; see also

Hawkins v. Pepsico, Inc., 203 F.3d 274, 279 (4th Cir. 2000) (finding no pretext where the

terminated plaintiff disagreed with her employer's evaluation of her work performance).[37]

Since Plaintiff is unable to present any evidence that Myers' decision was not the true reason for Carson's suspension, there is no showing of pretext.[38]  Accordingly, summary judgment is granted on Plaintiff's § 1981 claim concerning his suspension.


A separate order is attached.


Date: _____                     _____
                                            J. Frederick Motz
                                            United States District Judge

_____

[37]Plaintiff also argues that requiring him to take a drug test for steroids demonstrates pretext because there was no indication he had used drugs.  However, testing Plaintiff for steroid use was consistent with Myers' belief that he had acted violently.

[38]Plaintiff also argues that Giant made Carson sign a "last-chance letter" as a condition to his return to work in violation of Carson's union contract.  Plaintiff presents no evidence that this was actually in violation of the union contract.  Plaintiff also asserts that white employees were never forced to sign last-chance letters.  However, Plaintiff's only evidence is his own testimony that he did not know of a white employee who signed a last-chance letter.  (Carson Dep. at 221.)  This mere speculation is not sufficient to establish pretext.